Argued March 3, affirmed March 17, rehearing denied April 21, 1914.

## BEAN v. EYRE.

(139 Pac. 727.)

**Contracts—Construction—Joint Liability.**

Where defendant, a corporate stockholder, in consideration of the transfer to him of all the corporate property and the promise of the other three stockholders to pay to him the difference between the value of the property and the outstanding claims against the corporation, agreed to release his own claims and to pay all other claims in full, and one of the stockholders paid defendant his share, but the defendant secured a reduction in the claims of the creditors, the stockholder who paid defendant cannot recover the proportionate amount overpaid; the promise of the three stockholders to defendant being a joint obligation.

[As to the mutual rights and liabilities of parties to joint adventures, see note in Ann. Cas. 1912C, 202.]

From Marion: WILLIAM GALLOWAY, Judge.

This is a suit by F. D. Bean against G. W. Eyre for an accounting. There was a decree in favor of defendant, and plaintiff appeals. The facts are fully stated in the opinion of the court.          AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Walter C. Winslow.*

For respondent there was a brief over the names of *Messrs. Carson & Brown* and *Mr. Grant Corby*, with oral arguments by *Mr. John A. Carson* and *Mr. Corby.*

Department 1.   MR. JUSTICE MOORE delivered the opinion of the court.

This is an appeal by the plaintiff, F. D. Bean, from a decree dismissing a suit instituted for an accounting and to declare a trust. The evidence shows that the defendant, G. W. Eyre, about July 15, 1910, sold and assigned a stock of boots, findings and furnishings and store furniture and fixtures at Salem, Oregon, to Bean,

C. E. Rinehart, Jr., and H. C. Pugh, for $9,000 evidenced by their several promissory notes, each for one third of that sum, of which $750 matured on each note in one year and a like amount being payable on each annually thereafter, with interest from date at the rate of 6 per cent per year, payable semi-annually. The purchasers on the following day incorporated "The Boot Shop," with a capital stock of $10,000, divided into 100 shares of $100 each. They on July 25, 1910, entered into a written agreement with Eyre, whereby it was stipulated that, since such sale was made wholly upon credit, he should be given one share of the capital stock of the corporation, elected a member of the board of directors and vice-president; that until such notes were paid he should be fully informed as to the control and management of the corporate business; that no purchases of goods should be made without conferring with all the officers of the corporation; and that during any month its indebtedness should not exceed $2,500. At the same time and pursuant to their respective subscriptions therefor, certificates for 33 shares each of the capital stock were issued to Bean, Rinehart and Pugh, and for one share to Eyre, in consideration whereof the purchasers of the goods executed to the corporation a bill of sale thereof and also assigned to Eyre their certificates of stock as collateral security for the payment of such notes. Each of the stockholders was elected a member of the board of directors, Rinehart being chosen president, Eyre, vice-president, Bean, secretary, and Pugh, treasurer, and it was then resolved that since each of these officers, except Eyre, was required to devote his entire time to the business of the corporation, he should receive a salary of $20 a week, payable on each Saturday.

Without the consent or knowledge of his associates, and in violation of the express terms of their written agreement, Rinehart in the fall of 1910, ordered from manufacturers for the spring trade, boots, shoes, etc., the value of which amounted to more than $6,000. As bills therefor were received, the corporation not having obtained from the sale of its goods sufficient money with which to liquidate these demands began about January 1, 1911, to make partial payments on account thereof. During the succeeding month and with the defendant's consent, Rinehart assigned all his interest in the corporation to his brother, A. J. Rinehart, who executed to Eyre a promissory note for $3,000, in lieu of that given by C. E. Rinehart, Jr.

In the spring of 1911 the corporation was unable to pay for goods which had been delivered, whereupon the defendant indorsed three notes of $1,000 each, and money was thereby obtained from a bank and applied on the accounts. In August of that year, in order to meet the payment of pressing demands for goods received by the corporation, the defendant agreed with its other officers that a sale of boots and shoes might be conducted at greatly reduced rates. As a condition precedent to such assent, the defendant's son, G. E. Eyre who by the witness is called Earl and who will be hereinafter so designated, entered the store August 26, 1911, as cashier and representative of his father. A few days after Earl began the performance of his duties, and the second day after the sale commenced, suspecting that goods were surreptitiously being taken from the store, he placed padlocks upon the doors, retaining the keys, and forbade the postman from delivering mail, addressed to the corporation, to any person but himself. He also canceled orders for goods that had not been shipped. At his request an inventory of the stock in the store was

taken by persons appointed by him for that purpose. The plaintiff and others at the same time also made out a list of the creditors of the corporation and the sum of money due each respectively, including therein the $9,000 evidenced by the promissory notes given to the defendant and the $3,000 for the payment of which he had indorsed at the bank, whereupon it was discovered that the indebtedness thus represented exceeded the assets by $2,553. In order to effect an adjustment of such deficiency, a meeting was held September 21, 1911, at which were present Bean, Pugh, A. J. Rinehart, Earl Eyre, G. W. Eyre, and J. A. Carson, attorney for the latter, and it was stipulated that the defendant would accept the remaining stock of goods, settle with the creditors of the corporation, pay the bank the $3,000 for which he was liable, surrender to the makers their several promissory notes, amounting to $9,000, and cancel the shares of stock held as collateral security, and in consideration thereof Bean, Pugh and A. J. Rinehart, Jr., engaged to pay the $2,553.

The defendant on October 5, 1911, mailed circular letters to creditors of the corporation notifying them that, having been obliged to take charge of its store in order to adjust an indebtedness to him of more that $12,000, he suggested that it would be advisable to effect some settlement of their demands and stated that in his opinion 60 per cent of the invoice price of the goods could be obtained for them. In another letter written 10 days later, he informed the creditors that he had not then decided whether it would be better to compromise with them or institute proceedings in bankruptcy. Pursuant to the agreement of September 21, 1911, the plaintiff in discharging a part of the deficiency of $2,553, received a credit of $534.10 on account of salary due him, and on October 3, 1912,

he also paid $316.90 as the remainder of one third of the sum stated, whereupon he ceased working for the corporation, and his promissory note of $3,000, on which he had paid only $90 as interest, was returned to him. Rinehart quit the service of the corporation September 23, 1912, having overdrawn his salary $63.83. Pugh continued in the employment of the Boot Shop until January 20, 1912, when there was due him for wages $101.65, which sum should be credited on the deficiency. The promissory notes of $3,000, severally given by Rinehart and Pugh, were surrendered to them and their certificates of stock and that of Bean were canceled, and new certificates were issued to others in lieu thereof. Another board of directors was chosen, and new officers were elected, whereupon the corporation continued doing business after September 21, 1911, as before; the defendant buying on his own credit additions to the stock as needed and, from the proceeds obtained from a sale of goods, indebtedness was liquidated. An inventory was taken January 1, 1912, and the value of the stock was found to be $9,838.05. The corporation on February 26, 1912, being indebted to the defendant in the sum of $13,160.64, undertook to secure that amount by giving him a chattel mortgage of all its property. From January 1, 1912, to March 18th of that year, goods were sold, the cost prices of which were $1,274.22, thereby reducing the invoice to $8,563.83. In the meantime, however, new goods had been purchased by the defendant of the value of $4,611.18, thus showing the assets to have been the sum of $13,175.01. The corporation on March 20, 1912, sold all of its property for $7,642.65, thereby receiving 58 per cent of the invoice value of the goods. The defendant's chattel mortgage was also canceled, and on March 28, 1912, by

a unanimous vote of all of the stockholders the corporation was dissolved.

Papers constituting a summary of an invoice of the stock of goods made at the request of Earl Eyre and a statement of the indebtedness of the corporation and of its stockholders on account of their purchases from the defendant and of his accommodation indorsements, as prepared by Bean and his associates and forming the basis of the settlement of September 21, 1911, were received in evidence and have been brought up with the transcript. The total indebtedness as thus exhibited was $20,917.06, while the entire assets were valued at only $18,471.45, thereby leaving a deficiency of $2,499.61. This shortage was evidently increased when the agreement to pay was effected, for it will be remembered that the defendant received from Bean $851 as a third of the excess of indebtedness, thereby making such overplus $2,559, instead of $2,499.61 as reported.

J. D. Iddings, who was employed after September 21, 1911, as bookkeeper by the corporation, testified that its indebtedness at the time of the settlement exceeded the sum set forth in the statements referred to in several particulars, the most important of which was in the demand of Johnston & Murphy, which was given as $409.40 when it should have been $864.90.

The defendant from the money derived from the sale of the goods paid the bank $3,000 for which he was liable as an indorser and also settled with all the creditors of the corporation, but in doing so he did not in each case pay them the full amount of their demands. From an examination of the books of the corporation which were received in evidence it appears that in the settlement of claims against it, amounting to $5,758.11, the defendant secured a discount of $1,434.53 or a reduction of nearly 25 per cent. After the entire

corporate indebtedness had been discharged by the defendant, there remained $934.33 to be applied on the original price of $9,000 on account of the stock of goods sold to Bean, Pugh and Rinehart, whereby he sustained a loss of $8,065.67.

The plaintiff testified that he was informed by the defendant when Earl Eyre took charge of the store that his son was authorized to represent him in all matters pertaining to the business; that at the meeting held September 21, 1911, when it was proposed that the defendant would take the property of the corporation, pay its debts, and surrender to the makers their several promissory notes of $3,000 each, Earl stipulated that his father would liquidate each creditor's claim by paying 100 cents on the dollar thereof. Bean is corroborated in the particulars indicated by the testimony of Pugh and Rinehart and is not contradicted by Earl Eyre, who gave no testimony on this branch of the case.

J. A. Carson, referring to the meeting of the stockholders held September 21, 1911, testified in effect that he then and there stated to them that the demands of the creditors of the corporation would have to be adjusted, and suggested that the defendant could possibly secure a more advantageous settlement of such claims than the other stockholders, "meaning less than 100 cents on the dollar."

The defendant, though present at the meeting when the settlement was effected, did not himself make any promises to pay the creditors of the corporation in full. He testified that he liquidated many bills for goods taking as evidence of the adjustment receipts which he could not produce, and that after settling with all the creditors he did not have a cent to apply on his claim of $9,000.

The plaintiff's claim to equitable relief is based on the assent of Earl Eyre made in the presence of his father at the meeting held September 21, 1911, to pay all the creditors' demands against the corporation in full. The writer believes that Bean gave $851, or one third of the assumed indebtedness of the corporation, relying upon such promise, and, since an average discount of 25 per cent was secured by the defendant in settling with the creditors of the corporation, there should be returned to the plaintiff one fourth of the sum so paid by him, or $212.75. My associates, however, are of the opinion that the agreement of Bean, Pugh and Rinehart to pay the excess of the indebtedness of the corporation was a joint and not a several obligation on their part, and, as Pugh and Rinehart have not complied therewith, the plaintiff is without remedy as against the defendant.

Complaint is made by plaintiff's counsel of the letters written by the defendant to the creditors, as hereinbefore referred to, wherein he stated that the corporation was indebted to him in the sum of more than $12,000 when such demand was evidenced by the obligations of the stockholders. The testimony shows that the defendant is a farmer and evidently not versed in the technicalities of the law, for, if he had possessed more knowledge of that branch of learning and exercised less faith in the ability of the stockholders to meet the payment of their obligations, more care would probably have been practiced in the original dealings with them.

Equity looks through the transactions and determines their force and effect from the intention of the parties, and, when their dealings are viewed in that light, the defendant was substantially a creditor of the corporation whose claims, however, were subordinate to the demands of the general creditors.

The several promissory notes of $3,000 each were returned to the makers, and, if no agreement had been effected as to the payment of the indebtedness of the corporation, it is quite probable that judgments could have been secured thereon, or on the original subscriptions for the corporate stock.

Thus attempting to express the views of my associates, the decree is affirmed.            AFFIRMED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BURNETT and MR. JUSTICE RAMSEY concur.